In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-16-00388-CR
NO. 09-16-00389-CR
NO. 09-16-00390-CR

_____

OMAR HUITRON HERNANDEZ, Appellant

V.

THE STATE OF TEXAS, Appellee

**On Appeal from the 359th District Court**
**Montgomery County, Texas**
**Trial Cause Nos. 16-09-10158-CR and 16-09-10164-CR (Counts 1 & 2)**

**MEMORANDUM OPINION**

In twelve issues, Omar Huitron Hernandez argues that his three judgments of

conviction for sexually assaulting Gina,[1] his child, should be reversed. Grouped into

---

[1] We identify the victim and all her family members, except her father, with pseudonyms. *See* Tex. Const. art. I, § 30(a)(1) (granting victims of crimes "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

1

topics, Hernandez contends that (1) the judgments of conviction should be reversed because they are unsupported by evidence sufficient to prove the sexual assaults occurred, (2) the trial court should not have allowed the jury to consider certain evidence and testimony during his trial, and (3) the errors in the trial deprived him of a fair trial and his sentence to life in prison is cruel and unusual. For the reasons explained below, we affirm.

Background

In June 2014, fifteen-year-old Gina called 911 and told the operator that her father, Hernandez, had been sexually abusing her for years. Gina, Gina's mother "Maria," and Hernandez, were three of the witnesses who testified in the guilt-innocence phase of Hernandez's trial. Together with a specific scientific test result and the testimony about its significance, the testimony before the jury from Hernandez, Maria, and Gina is the primary evidence the jury likely used in reaching its conclusions to find Hernandez guilty of the various sexual assaults.

The parties tried the case in a jury trial in September 2016. During the trial, Gina testified that Hernandez began abusing her when she "was little." Gina testified during the trial that Hernandez penetrated her sexual organ with his penis when she was eight years old, and that he continued to do so on a regular basis until she

2

reported his conduct to the police. According to Gina, she and Hernandez had sexual intercourse for the last time in his truck, two days before the day she called 911.

Gina provided detailed descriptions about where the various sexual assaults that were alleged in the indictments occurred. When asked why she never reported Hernandez's sexual misconduct before June 2014, Gina explained that Hernandez had threatened to kill her and to kill Maria if she ever told anyone about his conduct. Gina also testified that Hernandez told her that if she told Maria about the fact she and Hernandez had engaged in sexual acts, he would blame Gina so that "my family would never want me again."

Maria testified during the trial about what occurred to precipitate Gina's decision to call 911. According to Maria, Gina and Hernandez argued often with each other about Gina's internet usage, which Maria explained that Hernandez believed was interfering with Gina's grades. Maria explained that just before Gina called 911, Gina and Hernandez had been arguing because Hernandez had taken away Gina's access to the internet. According to Maria, Gina told Hernandez that "he was a bad father." Around ten o'clock p.m. that same evening, Maria heard Gina call 911. When asked why Gina was calling 911, Maria testified that Gina said, "she was calling them because her dad had been sexually abusing her since she was around 10-years-old." Maria also testified that right after Gina told her that

3

Hernandez had been sexually abusing her for years, Maria confronted him about his alleged sexual misconduct. According to Maria, Hernandez responded to her by stating: "[Gina] provoked him." The jury could have reasonably viewed Hernandez's statement as a tacit admission that sexual abuse had occurred. After Hernandez blamed Gina for her role in his alleged misconduct, Maria slapped him and told him to leave. Maria testified that as Hernandez was leaving, he asked Gina and Maria "to forgive him." Maria confirmed that Hernandez fled the house in his truck before the police arrived in response to Gina's call to 911.

When Hernandez testified in the trial, he did not dispute that he fled the house before the police arrived. Hernandez testified that after Gina called 911, he went to Houston, borrowed a van from his brothers, drove the van to the Mexican border, left the van in Texas, and entered Mexico on a bus. Hernandez explained that after he arrived in Mexico, he contacted Gina through an internet messenger service. Without objection, the trial court admitted into evidence the original Spanish and the English-translated copies of the messages that Gina received from Hernandez while he was in Mexico. As translated, one message said: "[My daughter] please forgive me[.] [My daughter] you have a very big heart and I know you don't hate me forgive me[.]" As translated another of the messages states: "[A]nswer me little girl[.] I know the damage that I did to you but I am sorry. I am alone and I don't know what

4

to do[.] I lost all my family." During cross-examination, Hernandez made a statement relevant to the view the jury likely adopted regarding the significance of a male-chromosome analysis of the material extracted from a swab linked to the inside of Gina's sexual organ. According to Hernandez, he was not claiming that Gina had engaged in any sexual acts with any of his brothers or his son, the other male members in his familial line.

Hernandez denied having ever sexually assaulted Gina when he testified at trial. He sought to explain why he fled his home and went to Mexico, explaining that he was afraid of the police because he did not have the proper documents to live in the United States. Hernandez also provided the jury with an innocent explanation for the messages he sent to Gina while he was in Mexico, indicating that he intended the messages to convey that he was sorry for telling Gina she was not his daughter.

Hernandez lived in Mexico for around three months before he returned to the United States. When he returned, he went to Houston where his brothers lived and got a job. When the police located him, Hernandez saw them raiding the place where he was working so he tried to flee. Both Hernandez and Louis LaBarge, a United States Marshall involved in the operation that led to Hernandez's arrest, described the unsuccessful efforts Hernandez made to avoid being arrested where he worked.

5

Two Montgomery County Sheriff's Department Officers, Deputy Zachary Winford and Detective Fadi Rizk, testified about the investigation that the police conducted into Hernandez's case. Deputy Winford went to Gina's house on the evening she called 911. According to Deputy Winford, he obtained written statements that evening from Maria and Gina, he photographed various items in the home that he thought might be relevant to the case, and he collected the clothing that Gina suggested she was wearing during the sexual assaults that she alleged had occurred two days before she called 911.[2] Deputy Winford recalled telling either Gina or Maria that Gina should get a SANE[3] exam. Although Gina gave Deputy Winford a written statement and he filled out a police report, neither document was offered or admitted into evidence during the trial. We also note that Deputy Winford testified that Gina and Maria told him that the clothing he collected from Gina the night he went to their home had been washed. Winford described Maria's and Gina's

---

[2] Testimony by the forensic scientists who performed DNA tests on various items of Gina's clothing revealed that the Crime Lab never tested the clothes that Deputy Winford collected from Gina for the presence of DNA.

[3] During Deputy Winford's testimony, the prosecutor advised the jury that the acronym "SANE" stood for a "Sexual Assault Nurse Exam. Rape kit is kind of a common name - - term used for that."

appearance that evening as "[v]ery upset, crying[,]" but he also stated that he did not remember much more about the investigation he conducted while at their home.

Detective Rizk is the detective who was placed in charge of the investigation into Hernandez's case. During his testimony, he explained that he was present when Gina gave a forensic interview to a forensic examiner, Mayra Domingue, at Children's Safe Harbor. The prosecutor asked the detective about his impression of Gina in the interview: he stated that he found Gina "to be very believable[.]" Defense counsel objected to the detective's response, arguing that Detective Rizk had improperly commented on Gina's credibility. The trial court sustained the objection and instructed the jury to disregard the answer. But when defense counsel requested a mistrial, the court denied the motion.

Accompanied by Gina, Detective Rizk went to several locations where Gina claimed the various sexual assaults had occurred. While there, he took photographs, but he explained in the trial that he found no physical items of evidence containing biological material that could have been subjected to further testing to corroborate Gina's claims. Detective Rizk also collected DNA swabs from Hernandez, which he sent to the crime lab for testing.

Mayra Domingue, the person who conducted Gina's forensic interview, testified extensively in the trial about what Gina told her during the interview. The

trial court allowed Mayra to relate what Gina told her to the jury after designating Mayra "as an outcry witness under [article] 38.072." *See* Tex. Code Crim. Proc. Ann. art. 38.072 (West Supp. 2017). During the trial, Mayra testified that Gina "described [Hernandez] as a child abuser and a sexual abuser, because he used to make her have sex with him by force." Gina told Mayra that Hernandez began abusing her when she was in first or second grade. Gina also gave Mayra a detailed description of the various sexual assaults, including that Hernandez had touched and penetrated Gina's sexual organ. Mayra testified that Gina told her that her sexual encounters with her father occurred monthly after she became a teenager. Mayra also stated that Gina told her the sexual assaults had occurred over the years in a house where the family formerly lived, at an abandoned property, and inside Hernandez's truck.

Two nurses trained in performing sexual assault exams, Jamie Ferrell and Kara Temple, discussed the purpose of the examinations they perform in sexual assault cases on individuals who claim to have been the victim of a sexual assault. Ferrell testified that she is a certified sexual assault nurse, and the head of forensic nursing at Memorial Herman Health Systems. When Ferrell testified, she described the general techniques and purposes of conducting a sexual assault exam. Ferrell explained that even if a patient has no signs of having suffered a physical injury, the

finding of no injury would not necessarily cause her to conclude that no sexual assault occurred.[4]

Kara Temple, the nurse who conducted Gina's sexual assault examination, is the other nurse who testified in the trial. According to Temple, when she examined Gina, she was a certified sexual assault nurse.[5] Temple explained that during the sexual assault examination she performed on Gina, Gina told her that Hernandez sexually assaulted her three days before the exam. Temple stated that Gina gave her a history that the last of the assaults occurred when Hernandez penetrated Gina's sexual organ with his penis. Temple also testified that Gina told her that Hernandez had sexually assaulted her one week before the most recent assault, and that he had been sexually assaulting her for more than ten years.

Temple described the physical examination that she performed on Gina. According to Temple, she identified nothing to show that Gina had suffered a physical injury. Temple explained that she collected biological samples from various locations on Gina's body, including a swab from the inside of Gina's sexual organ.

---

[4] On cross-examination, Ferrell agreed that the lack of physical trauma might also mean that no sexual assault had occurred.

[5] Temple was no longer certified as a sexual assault nurse when the trial occurred. She explained that she still works as a nurse, and that she allowed her certification to lapse because she decided to change her nursing goals.

9

Temple stated that she put the swabs she collected during her examination of Gina into a package, which she sealed, and that she then placed the package in an evidence locker.

Two witnesses from the Department of Public Safety's crime lab, Adam Vinson and Kathleen McKinney, described the testing they performed on the various items they received from the individuals involved in the investigation of Hernandez's case. Vinson explained how he used swabs to collect biological material from the various items of clothing that were collected by the nurse during Gina's sexual assault exam. He explained that he made slides from the material that he collected with the cotton swabs.

McKinney, a forensic scientist at the Texas Department of Public Safety's crime lab in Houston, explained that she prepared two scientific reports about the tests the crime lab performed on the materials tested there. Over Hernandez's objections, the trial court allowed the jury to consider the reports McKinney prepared about the tests the crime lab performed on the various swabs that the chain-of-custody testimony linked to Hernandez's case. McKinney explained that the crime lab performed a DNA test on a swab linked to the underwear that Gina removed when she was examined by the sexual assault nurse. According to McKinney, the swab of the inside of Gina's underwear contained a DNA mixture

that came from more than one individual.[6] The profiles extracted from that mixture revealed a high probability that Hernandez could have contributed to the mixture found on the swab associated with the inside of Gina's underwear. Yet McKinney conceded on cross-examination that if the clothes were washed with the clothes of other family members, the DNA on a washed item of clothing could originate from a transfer that might have occurred when the clothes were laundered.

McKinney's main testimony as it is relevant to the appeal concerns the testing she performed on swabs linked to Gina's sexual organ. According to McKinney, she performed a Y-STR chromosome test on the swab linked to the inside of Gina's sexual organ, and she described the test as one that analyzes biological material for the presence of male, Y chromosomes. According to McKinney, the results of the specialized, Y-chromosome tests revealed "[a] partial Y-STR profile [obtained from a vaginal swab associated with Gina's sexual organ, which] is consistent with the Y-

---

[6] The evidence in the trial established that the pair of underwear Gina provided to the sexual assault nurse examiner was not the pair that Gina was wearing on the date she testified that she last engaged in sexual intercourse with Hernandez. Additionally, the State made no effort to prove that the underwear collected during the sexual assault exam was specifically tied to any of the sexual assaults at issue in the trial. In contrast, Deputy Winford collected the underwear that Gina claimed she was wearing when she last had sexual intercourse with Hernandez. While the Montgomery County Sheriff's Office examined these, the screening test they conducted was negative for semen and although the underwear was forwarded to the crime lab, the crime lab never tested them for reasons that are not explained by the record.

STR profile of Omar Hernandez." McKinney's Y-chromosome report concludes by stating that "any paternally-related male relatives of Omar Hernandez cannot be excluded as being the contributor of this male DNA profile."

## Issues

For convenience, we divide Hernandez's twelve issues into three general topics, (1) Challenges to the Sufficiency of the Evidence, (2) Evidentiary Issues, and (3) Cumulative Error and Excessive Sentence. The issues that Hernandez raises challenge his convictions in (1) trial court Cause Number 16-09-10164-CR (Count II), which addresses Hernandez's conviction for continuous sexual abuse of a child; (2) trial court Cause Number 16-09-10164-CR (Count 1), which addresses Hernandez's conviction for the aggravated sexual assault of a child; and (3) trial court Cause Number 16-09-10158-CR, which addresses Hernandez's conviction on the charge of sexually assaulting a child. *See* Tex. Penal Code Ann. §§ 21.02(b), 22.011(a)(2)(A), 22.021(a)(1)(B) (West Supp. 2017).

### I. Challenges to the Sufficiency of the Evidence

#### A. Standard of Review

In issues nine, ten, and eleven, Hernandez challenges the sufficiency of the evidence supporting each of his convictions. If Hernandez were to prevail on these issues, he would be entitled to judgments of acquittal. *See*

12

S.W.3d 893, 898-902 (Tex. Crim. App. 2010). Because these issues would give Hernandez the greatest relief if they have merit, we begin our discussion with them. *See* Tex. R. App. P. 43.3; *Campbell v. State*, 125 S.W.3d 1, 4 n.1 (Tex. App.— Houston [14th Dist.] 2002, no pet.) (stating that a reviewing court should first address the issues affording the appellant the greatest relief).

We review the sufficiency of the evidence to support a conviction under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See Brooks*, 323 S.W.3d at 895. Under that standard, we view all the evidence the jury considered in deciding the case in the light that most favors the verdict. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 318-19). After considering the evidence in that light, we determine if a rational factfinder could have found in the State's favor on all the elements of the offense that it was required to prove to establish that the defendant committed the charged crime based on a standard of beyond reasonable doubt. *Id*.

"After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element" of the crime. *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009). In assessing whether the evidence is sufficient to support the jury's verdict, we note that appellate courts must be deferential to the decisions that juries make since juries

13

are given the responsibility to judge the credibility and the weight that should be assigned to the evidence that might be admitted during a defendant's trial. *Id*. Generally, the jury may choose to believe some, all, or none of the testimony admitted into evidence in the trial. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). And the jury may draw multiple reasonable inferences from a given set of facts so long as each inference is supported by the evidence before it in the trial. *Temple*, 390 S.W.3d at 360. If the record would have allowed the jury from the inferences that it drew to go either way, we presume the jury resolved any conflicts that existed in the evidence in favor of the verdict that it reached. *Id*. Thus, we defer to the jury's determination over the inferences that it chose to draw from the facts proven in the defendant's trial. *Id*.

In reviewing a challenge claiming the evidence cannot support the jury's verdict, we consider all the evidence admitted during the trial even if the trial court erred when admitting it. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). A jury may find either direct or circumstantial evidence to have been probative of the defendant's guilt, and "'circumstantial evidence alone can be sufficient to establish guilt.'" *Temple*, 390 S.W.3d at 359 (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). In a circumstantial evidence case, each of the facts admitted before the jury need not point directly to the defendant's guilt

14

so long as the combined and cumulative force of all the incriminating circumstances warrants the jury's conclusion that the defendant was guilty of the elements of the crime with which he was charged. *Id.*; *Hooper*, 214 S.W.3d at 13.

In cases involving sexual assaults committed against children, the Texas Court of Criminal Appeals has determined that a child's testimony alone is sufficient to prove that the alleged assault occurred. *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978). The Code of Criminal Procedure codifies this concept into the law since it provides that a conviction for sexually assaulting a child is supportable by "the uncorroborated testimony of the victim of the sexual offense[.]" Tex. Code Crim. Proc. Ann. art. 38.07(a) (West Supp. 2017).

B. Analysis, Issue Nine through Eleven

The State charged Hernandez with three crimes alleging that he committed various sexual assaults, the earliest of which occurred in 2004. In his brief, Hernandez suggests the evidence admitted during his trial is insufficient to support his convictions. Mainly, Hernandez argues that the jury should not have accepted Gina's testimony because she did not give consistent testimony about the various details relating to the various assaults, such as how old she remembered being when the first of the sexual assaults occurred. Also, Hernandez argues that Gina gave accounts that were not entirely consistent about the details of the assaults to the

various individuals she told of the assaults, including the assault Gina claims occurred several days before she called 911. Finally, Hernandez suggests that because Gina was angry with him about disciplining her by restricting her internet use, she retaliated against him by creating a false story to get him into trouble.

Hernandez is also critical of the manner the police handled the investigation into his case. He noted that Detective Rizk never located any items of physical evidence that Gina described that might have corroborated Gina's version about where the alleged sexual assaults occurred. Hernandez points to the fact that the sexual assault nurse failed to find any physical injuries on Gina's body, a lack of evidence that he argues is important to evaluating the weight of the evidence regarding that alleged assault. Hernandez suggests an innocent explanation exists for the fact that his DNA was found inside the underwear Gina gave the sexual assault nurse, noting that the testimony showed that it had been washed with other family clothes before it was tested at the crime lab. Hernandez concludes that because Gina was angry with him, and given the lack of any strong corroborating evidence, a reasonable jury would have disregarded Gina's testimony and found him not guilty.

A careful review of the evidence, however, reveals that Hernandez's convictions do not rest solely on Gina's testimony. For example, the Y-STR report is based on a specimen that the sexual assault nurse obtained from inside Gina's

16

sexual organ about three days after the last sexual assault. From the testing on that specimen, the jury could have reasonably concluded that the specimen found inside Gina's sexual organ contained a male, Y chromosome, which was consistent with any male in Hernandez's direct familial line. Given Hernandez's own testimony that he was not claiming that Gina had been having sexual intercourse with any of the other males in his family line, a reasonable jury could conclude that Hernandez was the donor of the chromosome profile linked to the swab associated with Gina's sexual organ.

As the finder of fact, the jury also could reasonably view the evidence of Hernandez's flight from his home after Gina accused him of sexual misconduct as evidence showing that he knew he was guilty of sexually assaulting her. *See Clay v. State*, 240 S.W.3d 895, 905 & n.11 (Tex. Crim. App. 2007) (noting that evidence of flight suggests a consciousness of guilt). Hernandez fled police not just once but twice, as he attempted to avoid being arrested when the police came to the location where he was working to arrest him based on charges the State filed after Gina reported the alleged sexual assaults. When viewed in the light most favorable to the jury's verdict, the evidence that Hernandez fled is circumstantial evidence that supports the jury's verdict finding Hernandez guilty of the various sexual assaults.

17

The jury was also entitled to view the messages Hernandez sent Gina as evidence supporting the findings that it made regarding Hernandez's guilt. Like flight, a jury may view an apology as evidence showing a defendant's guilt. *See Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no writ). When weighing the likely effect of evidence, courts have stated that "consciousness of guilt is perhaps one of the strongest kinds of evidence of guilt." *Id.* (internal quotations omitted). Thus, even though a defendant has phrased an apology in vague terms, a jury has the right to view the apology as incriminatory evidence as related to questions surrounding the defendant's alleged guilt. *See Yost v. State*, 222 S.W.3d 865, 877 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (concluding that a letter from accused to victim saying "I am sorry for everything" was a significant circumstance suggesting guilt).

In a criminal case, juries have a right to decide whether the witnesses who testified were credible and to decide what weight, if any, should be attached to a witness's testimony. *See Jackson*, 443 U.S. at 319. Ultimately, when the evidence and inferences available from it are in conflict, appellate courts must presume that the jury resolved any conflicts that existed in favor of the manner the jury voted to reach its unanimous verdict. *See id.*, 443 U.S. at 326.

In conclusion, while Hernandez points to various conflicts and inconsistencies that exist in the evidence admitted during his trial, the conflicts that he points out are not so significant that the jury could not have reasonably decided to credit Gina's testimony that the sexual assaults occurred. *Id*. We conclude that issues nine through eleven which assert the evidence was insufficient to support the verdict lack merit, so they are overruled.

## II. Evidentiary Issues

### A. Standard of Review

In issues one through six, Hernandez complains that the trial court abused its discretion by admitting various testimony and exhibits during his trial. Before addressing the specifics of the complaints in detail, we address the standard of review used to evaluate a trial court's decisions to either admit or to exclude evidence in a trial.

To establish that a trial court erred when it admitted or excluded evidence, the party complaining about the ruling must show in the appeal that the decision the trial court made constituted an abuse-of-discretion. *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). In contrast, if the trial court's ruling is correct under any theory of law that applies in the case, the ruling will not be overturned on appeal. *See Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). To establish that

19

error occurred, a party must establish that the evidentiary ruling at issue "was so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) (citing *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003)).

## B. Gina's 911 call and Maria's testimony about what Gina told her just before Gina called 911

In issue one, Hernandez argues that the trial court erred when it admitted Maria's testimony about what she heard Gina say just before Gina called 911. During the trial, Maria told the jury that when she asked Gina why Gina was calling the police, Gina said that Hernandez had been abusing her since she was ten years old. The transcript from the trial shows that the trial court admitted Maria's testimony about Gina's statement as excited utterance, which is a recognized type of exception to the rule that generally prohibits the admission of hearsay in a trial. *See* Tex. R. Evid. 803(2) (making statements relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused, admissible as exceptions to the general rule that prohibits the admission of hearsay).

The Texas Court of Criminal Appeals applies these three criteria to decide if a statement was properly admitted at a trial as an excited utterance: "(1) the 'exciting event' should be startling enough to evoke a truly *spontaneous* reaction from the declarant; (2) the reaction to the startling event should be quick enough to avoid the

20

possibility of fabrication; and (3) the resulting statement should be sufficiently 'related to' the startling event, to ensure the reliability and trustworthiness of that statement." *McCarty v. State*, 257 S.W.3d 238, 241 (Tex. Crim. App. 2008). The startling event need not be the original event, but "may trigger a spontaneous statement that relates to a *much earlier* incident." *Id.* at 240 (emphasis in original). An abuse-of-discretion standard applies to the trial court's decision to classify a statement as an excited utterance. *See Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006).

The circumstances that Gina and Maria described in the trial, which led to Gina's decision to call 911, allowed the trial court to conclude that Gina was under significant emotional distress shortly before, during, and immediately after she called 911. Just before Gina called 911, Maria overheard Hernandez and Gina arguing after Hernandez told Gina that she was "stupid." Before Gina made the statement at issue, she first tried to call 911 with her parents in a nearby room, where she could have reasonably been concerned that they might overhear her conversation. Given Gina's testimony about the threats Hernandez had historically made over the years the alleged abuse had occurred, together with Gina's proximity to her parents on the night she called 911, the trial court could reasonably conclude that Gina was in an emotionally charged state from a startling event, the argument

21

she had with Hernandez that night, triggered by the sexual assault two days before, which led to Gina making the statements that Maria heard before, during, and shortly after Gina called 911. Given the context in which the call occurred, the trial court could reasonably conclude that Gina was in a charged emotional state when Maria heard the statements Gina made because she had not had time to reflect on the comments as they relate to the time frame surrounding the phone call Gina made to 911. *See* Tex. R. Evid. 803(2).

In his brief, Hernandez views the startling event precipitating the case as one that related solely to the alleged sexual assault that occurred two days before Gina called 911. But the circumstances described by the testimony allowed the trial court to conclude that a combination of startling events, which began with the last sexual assault, triggered by an emotionally charged argument between a teenager and her father, was the startling circumstance that gave the statements Maria heard Gina make the circumstantial guarantee of trustworthiness necessary to satisfy the excited utterance exception to the hearsay rule. We conclude the trial court did not abuse its discretion by admitting Maria's testimony about Gina's statements immediately before, during, and after Gina called 911 as excited utterances. We overrule Hernandez's first issue.

## C. Admissibility of Outcry Testimony

In issue two, Hernandez argues that Mayra Domingue was not a proper outcry witness because Gina was fifteen years old when Gina told her about the various sexual assaults that occurred prior to 2014. The State does not dispute that Gina was more than fourteen when Gina first told Mayra about these sexual assaults, but it argues that the "outcry exception to hearsay applies to statements made by a victim prior to [the victim's] eighteenth birthday." *See* Tex. Code Crim. Proc. Ann. art. 38.072 § 2(b) (allowing statements that qualify under article 38.072 as exceptions to the general rule prohibiting hearsay).

The evidence shows that Gina was fifteen years old in June 2014 when she told others about Hernandez's alleged sexual misconduct. Thus, Gina made the out-of-court statements that were the subject of Hernandez's objections when she was not yet eighteen. *See Eldred v. State,* 431 S.W.3d 177, 183 (Tex. App.—Texarkana 2014, pet. ref'd). We conclude that Hernandez's argument suggesting that Gina's statements were not properly admissible based on the requirements in article 38.072 has no merit, and we overrule his second issue.

In issue three, Hernandez argues that Mayra was not a proper outcry witness because Gina told Deputy Winford about the sexual assaults before Mayra interviewed Gina about the assaults. We review a trial court's decision to designate

23

a witness as an outcry witness using an abuse-of-discretion standard. *Garcia v. State*, 792 S.W.2d 88, 91-92 (Tex. Crim. App. 1990); *Rosales v. State*, 548 S.W.3d 796, 806 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd). An appeals court will uphold the trial court's designation of the witness if the decision is supported by the evidence. *Id.* On appeal, an appellate court will not find that an abuse of discretion occurred if the trial court's decision over the designation of the outcry witness was a decision that falls within the zone of reasonable disagreement. *Id.*

A proper outcry witness is the first adult to whom the child makes a statement that "in some discernible manner describes the alleged offense." *Garcia*, 792 S.W.2d at 91. The statement the child makes, however, "must be more than words which give a general allusion that something in the area of child abuse was going on." *Id.* According to the Court of Criminal Appeals, the statement the child gave to the outcry witness is one in which the child gave the witness a description or some details about the alleged offense. *See id.*

Here, the trial court conducted a hearing outside the presence of the jury to determine whether Mayra was the person to whom Gina gave a detailed account about the alleged sexual assaults. Mayra's testimony from the hearing shows that Gina told Mayra very specific details about the alleged assaults during her interview. When Mayra testified in the hearing, outside the presence of the jury, Deputy

24

Winford had already testified before the jury about his ability to recall what Gina told him when he responded to the report she made when she called 911. The deputy testified that he could no longer recall the specifics about the conversation that he had with Gina on the night she called 911. He provided little detail, explaining that Gina did tell him that the sexual assaults started about ten years earlier, but he provided no further details about any of those alleged assaults. Deputy Winford testified he recalled Gina giving him some details "about things that [Hernandez] allegedly had done to her[,]"[7] but he also testified that he did not ask Gina "for very many details because she was a juvenile." Deputy Winford did not relate any of the details about "the things" he referred to, and he also testified at one point that he could not recall what Gina told him.

On this record, the evidence shows that Gina told Deputy Winford that Hernandez had done something to her while she was growing up and that it involved sexual abuse. That said, the evidence does not show that Gina described the offenses to Deputy Winford in any significant detail. For example, nothing in the record shows that Gina told Deputy Winford the details about when, where, or how the

---

[7] No one asked Deputy Winford to define what he was referring to when he mentioned the "things" Hernandez did to Gina. Thus, it is unclear whether all the "things" that Deputy Winford was referring to when he testified amounted to criminal acts.

sexual assaults occurred before Gina turned fourteen. We conclude the trial court did not abuse its discretion by rejecting Hernandez's argument that Deputy Winford, not Mayra, should have been designated by the trial court as the appropriate outcry witness for the trial.[8] We overrule Hernandez's third issue.

D. Objections to Photographs of Underwear and Lab Reports

In issue four, Hernandez raises three basic complaints about the trial court's rulings to admit five exhibits. Three of the exhibits are photographs of a pair of Gina's underwear, collected by the sexual assault nurse. The other two exhibits are lab reports created by the crime lab, which summarize the tests and results on various swabs tested by the crime lab for the presence of Hernandez's DNA and for the presence of any male, Y chromosomes.

First, we address Hernandez's complaints about the ruling admitting the photographs of Gina's underwear. Hernandez argues that because the family had laundered the underwear that is seen in the photos with other family laundry, the

---

[8] In his brief, Hernandez suggests that the trial court could have concluded that Maria was an outcry witness. But the transcript of the trial reveals that Hernandez objected to Maria being the outcry witness because the statements Maria heard Gina make concerned the sexual assault that allegedly occurred just two days before Gina called 911. During the hearing, the State conceded that Maria was not a proper outcry witness, and the trial court admitted Maria's testimony about the statements she heard Gina make that night under the excited utterance exception and not under the outcry exception to the hearsay rule.

underwear in the photos was not relevant evidence because nothing in the evidence tied the underwear to the alleged incidents of sexual assault. In response, the State argues that the discovery of Hernandez's DNA on the inside of Gina's underwear was highly relevant to Hernandez's guilt even if his DNA was found there because the underwear had been laundered with other family laundry. According to the State, the presence of Hernandez's DNA on the underwear collected by the sexual assault nurse is "highly probative to the fact issue of whether [Hernandez] sexually assaulted [Gina]."

We need not decide if the photographs were inadmissible to resolve issue four. Generally, appellate court review alleged errors in admitting evidence as non-constitutional error. *Russell v. State*, 155 S.W.3d 176, 179 (Tex. Crim. App. 2005). Therefore, the appellate court must disregard the error (and affirm the verdict) unless the error "'has a substantial and injurious effect or influence in determining the jury's verdict.'" *Id*. (quoting *Simpson v. State*, 119 S.W.3d 262, 266 (Tex. Crim. App. 2003)). The error we have assumed occurred in Hernandez's trial concerns the photographs of Gina's underwear, so the error, if it occurred, is treated as non-constitutional error. *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007) (analyzing whether defendant was harmed by erroneous admission of photographs as non-constitutional error). Non-constitutional errors will not result in a verdict

27

being reversed if the record shows that the error did not influence the jury or had only a slight affect. *Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001) (citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)). "In considering the potential to harm, the focus is not on whether the outcome of the trial was proper despite the error, but whether the error had a substantial or injurious effect or influence on the jury's verdict." *Barshaw v. State*, 342 S.W.3d 91, 93-94 (Tex. Crim. App. 2011).

Based on the strong evidence admitted in Hernandez's case of his guilt, which was independent from the photographs of the underwear, the trial court's decision to admit the three photographs amounts to at most harmless error. The evidence supporting the jury's findings includes Gina's direct testimony about the sexual assaults. Circumstantial evidence also supports the jury's verdict, including a biological test showing that the crime lab found male genetic material from Hernandez's familial line inside Gina's sexual organ, evidence that Hernandez fled to Mexico after Gina reported him to the police, and evidence showing that while in Mexico, Hernandez contacted Gina requesting forgiveness for his conduct. Thus, both direct and circumstantial evidence before the jury during Hernandez's trial allowed the jury to conclude that Hernandez was guilty, beyond reasonable doubt. Given the State's failure to directly tie the underwear collected by the sexual assault

28

nurse to any specific assault and the concession of the State's expert that Hernandez's DNA on the underwear could be explained by the fact that the family laundered clothes in the same washer, we harbor strong doubt that the jury would have placed any weight on the photographs that are the subject of Hernandez's arguments in issue four. Thus, we conclude that any error that occurred in admitting the three photographs was harmless. *See* Tex. R. App. P. 44.2(b).

Second, we address Hernandez's complaint that the trial court erred by admitting the two crime lab reports, which revealed the results the crime lab obtained from testing the biological material collected during the State's investigation of Hernandez's case. According to Hernandez, neither the DNA report, nor the Y-STR report, corroborates Gina's claim that any sexual assaults occurred. He also suggests that the State had little need for the reports or testimony about them in proving its case. When addressing the admissibility of the reports, we also address Hernandez's argument claiming that the trial court erred in allowing the forensic scientist who prepared the reports, Kathleen McKinney, to explain the results and significance of information in the reports to Hernandez's case.

For convenience, we will first address Hernandez's complaints about the admissibility of the Y-STR report and about McKinney's testimony of that report's

29

significance in his trial. During the trial, McKinney testified that she signed the Y-STR report, and she explained what a Y-STR report shows. She testified:

> [Y-STR] actually just look[s] at the Y chromosome. That's all it is looking [for]. It doesn't look at any other part of the DNA. And so, it's only looking at male DNA. But the only thing with Y-STR is that it is passed down in the male lines. So, the grandfather, father, son, they're all going to have the same Y-STR profile. And this -- if you want to think back to the DNA steps, extraction, quant and detection, for this step, I actually just -- I went back to the extract that were already made for the DNA and I knew the quant. I already knew how much DNA was there, and so I just took it from the amplification on. I amplified it from a new kit. It's a Yfiler kit that only looks at the male DNA. It's just focusing on the Y chromosome part of the DNA. And I got the same type of pictorial representation, but it's Y-STR profile instead of a DNA profile.

Then, the prosecutor asked McKinney about the relevance of Y-STR testing in cases involving claims of sexual assault. She explained:

> In a case like this, when you have a sexual assault, it is reasonable to see a lot of the victim's DNA, because it is from her body or her clothing. And DNA if you have a lot of one contributor, can sometimes mask somebody else that is there. And so, in sexual assaults when there's a female/male type of situation, we will tend to do Y-STRs if we need to go that far to see if we can -- if we can actually detect male DNA that may not be detected in a regular DNA, because it's going to totally discount female DNA.

According to Hernandez, the Y-STR lab report and McKinney's testimony about the Y-STR testing lacked relevance to proving that he sexually assaulted Gina.

In our opinion, the trial court could properly find that the Y-STR report and McKinney's testimony about it were relevant to proving if Hernandez committed

30

the last sexual assault that occurred in mid-June 2014, just two days before Gina called 911. The testimony shows that the Y-STR report was based on a swab linked to biological material removed from the inside of Gina's sexual organ just three days after the June 2014 assault was alleged to have occurred. The test is based on a polymerase chain reaction analysis. The analysis on the fluids extracted by the lab from the swab associated with the inside of Gina's sexual organ revealed a Y-STR chromosome profile that, according to McKinney, tracked Hernandez's Y-STR profile. McKinney explained that a test tracking a known Y-STR profile made it highly probable that a male descendant in that person's family line contributed to the profile revealed by the test. Thus, because the Y-STR profile tracked Hernandez's profile, and because Hernandez testified that he was not claiming that Gina had sexual relations with any other male members of Hernandez's family,[9] the fit in the chromosome patterns was relevant evidence in proving that Hernandez and Gina engaged in sexual relations several days before the Y-chromosome profile, tracking his own, was found inside Gina's sexual organ. We conclude the trial court did not abuse its discretion by finding the Y-STR report and McKinney's testimony

---

[9] Hernandez testified during the guilt-innocence phase of his trial that he was not claiming that any other male family member had sexual intercourse with Gina.

31

about the Y-STR report to be relevant evidence in Hernandez's trial. *See* Tex. R. Evid. 401.[10]

Relying on Rule 403 of the Texas Rules of Evidence, Hernandez also argues that the Y-STR lab report and McKinney's testimony about it were unduly prejudicial. Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." When conducting a Rule 403 analysis, the trial court must balance:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). While evidence can be more prejudicial than probative, "there is a presumption that

---

[10] Rule 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Tex R. Evid. 401. Under Rule 402, relevant evidence is generally admissible unless another rule or statute provides otherwise. Tex. R. Evid. 402.

relevant evidence is more probative than prejudicial." *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997).

In deciding whether the trial court abused its discretion by overruling Hernandez's claim that the YSR-report and McKinney's testimony about it were not unduly prejudicial, we must determine whether the evidence was unduly prejudicial "'in view of all relevant facts.'" *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006) (quoting *Santellan*, 939 S.W.2d at 169). The fact that a Y-chromosome profile that tracked Hernandez's profile was found in Gina's sexual organ was highly relevant to the question of whether Hernandez and Gina had engaged in sexual relations, claims that Hernandez denied. And the testimony about the Y-STR report and its significance to Hernandez's case was not long or time consuming when viewed in the context of all the testimony in the trial. While this testing is not likely familiar to ordinary jurors, the Y-STR report and McKinney's testimony about it was not so complicated that the testimony would have been confusing to an ordinary jury. Considering both the relevant factors and all relevant facts in the record, we conclude that the trial court had the discretion to rule that the probative value of the Y-STR report and McKinney's testimony outweighed the prejudicial value, if any, of that same evidence. *See* Tex. R. Evid. 403.

In issue four, Hernandez also argues the trial court erred when it allowed the DNA report and McKinney's explanation of it to be admitted into evidence. Through McKinney and the DNA report, the prosecutor exposed the jury to the DNA testing that the crime lab performed on the underwear the sexual assault nurse had collected from Gina during her sexual assault exam. McKinney concluded that based on the DNA testing on the underwear, Hernandez could not be excluded as one of the persons who contributed DNA to the biological mixture found on a swab linked to Gina's underwear. Hernandez objected to McKinney's testimony about the results of the DNA test on the underwear and the DNA report before the jury heard McKinney testify about the DNA report and the significance of DNA testing in cases involving sexual assaults. He claimed the evidence was more prejudicial than probative on whether he committed the sexual assaults at issue in the trial. *See* Tex. R. Evid. 403. On appeal, Hernandez advances the same arguments in claiming the trial court abused its discretion by admitting evidence related the underwear Gina removed during her sexual assault exam. According to Hernandez, the report and testimony did

> not tend to corroborate the allegation of [s]exual abuse…the jury would be irrationally yet indelibly impress[ed] because of the fact the DNA of [Hernandez's] lineage was found in one of [Gina's] panties. At that point, it would not matter to the jury if it's because they washed the clothes in the same washer, [or] if that [the underwear tested] was not

34

the [underwear] that [Gina] was wearing the day she was allegedly sexually assaulted[.]

In our opinion, the jury likely did not rely on the DNA test report that addressed the DNA in the underwear given that the Y-STR testing provides a strong link under the circumstances of this case between Hernandez and Gina's claim that he sexually assaulted her. Moreover, there was also direct and circumstantial evidence supporting the jury's findings, which consisted of Gina's testimony about the assaults and Hernandez's conduct after Gina reported him to police for sexually assaulting her. As the factfinder, the jury had the right to credit Gina's testimony and to disbelieve Hernandez, as the jury's verdict is supportable based on Gina's testimony alone. *See* Tex. Code Crim. Proc. Ann. art. 38.07 (West Supp. 2017) (providing that a child's testimony alone is enough to support a conviction for aggravated sexual assault when the child, at the time of the offense, was seventeen or younger).

Even if we assume the trial court abused its discretion by admitting the DNA report and McKinney's testimony about it, the remaining evidence in the record supporting the jury's findings causes us to conclude that the error, if any, in admitting the evidence did not affect Hernandez's substantial rights. Having addressed all the arguments that Hernandez advances in his fourth issue, the issue is overruled.

E.  Leading Questions

In his fifth issue, Hernandez complains that the trial court allowed the prosecutor to ask Gina several leading questions while questioning her during the prosecutor's direct exam. According to Hernandez, the State then compounded that error by introducing a timeline on a chart, which the prosecutor prepared from Gina's testimony.

We review a trial court's decision allowing the prosecutor to lead the State's witnesses for abuse of discretion. *See Hernandez v. State*, 643 S.W.2d 397, 400 (Tex. Crim. App. 1982). The Rules of Evidence allow trial courts the right to control the manner that the parties use in presenting evidence during a trial. *See* Tex. R. Evid. 611 (Mode and Order of Examining Witnesses and Presenting Evidence). Ordinarily, trial courts will not allow a party to lead a witness during the witness's direct exam. *See* Tex. R. Evid. 611(c) (leading questions should not be used on direct). That said, trial courts retain the right to allow an attorney, in the court's discretion, to use leading questions on direct. *Id.* (allowing leading questions "as necessary to develop a witness's testimony"); *Wyatt v. State*, 23 S.W.3d 18, 28 (Tex.

36

Crim. App. 2000) (noting that while the rules generally prohibit leading questions "some leading questions are acceptable at the trial court's discretion").

The record shows that Gina testified on the second and third days of the trial. On the third day of the trial, the prosecutor began several of his questions by asking Gina whether she remembered stating the previous day that she had various sexual encounters based on a stated age at that time. It appears likely that the prosecutor chose to examine Gina using do-you-remember questions because given the lengthy chronological history and similarity between many of the sexual acts, it might have been difficult for the jury to put Gina's testimony in the context of the time frame in which she was claiming the various assaults occurred.

Rather than have Gina essentially repeat the same or similar testimony she had just given on the second day of the trial, the prosecutor prefaced several questions with a reference to the dates that Gina had mentioned during her testimony on the second day of trial. The questions appear to have been intended to allow the jury to more easily follow the chronology of the various sexual assaults that Gina claimed had occurred over a ten-year period. The prosecutor also created a timeline of events as Gina testified on the third day of the trial. In general, the timeline summarizes Gina's testimony about when, where, and what types of sexual assaults she claimed Hernandez had perpetrated on her over a period of about ten years.

37

Based on Gina's testimony, the chart ties various dates of the alleged assaults that occurred over a period of ten years to the locations where the assaults allegedly occurred and to the types of sexual acts that occurred in those locations.

When the prosecutor offered the chart into evidence, Hernandez's counsel objected to the exhibit claiming the prosecutor created the chart based on Gina's answers to the prosecutor's leading questions. In response, the State argues that the manner the prosecutor employed when questioning Gina did not suggest what her answer should be. For that reason, the State contends that the questions at issue were not leading.

The trial court overruled Hernandez's objection to the exhibit. In response to the ruling, Hernandez's counsel asked for and the trial court granted his request for a "running objection" to questions about whether Gina remembered specific testimony from the prior day of the trial. In ruling on Hernandez's request, the trial court told Hernandez's counsel that, as phrased, the prosecutor's questions did not suggest how Gina should answer the questions and instead asked Gina whether she could remember "something she just testified to [yesterday]."

Generally, the rules of evidence allow trial courts to exercise discretion over the method an attorney is using when interrogating witnesses. Tex. R. Evid. 611(a). Given the context in which the do-you-remember questions occurred, reasonable

38

people might disagree about whether the questions suggested the answer.[11] Given the discretion afforded trial court's in controlling the manner that a party presents its evidence, the trial court's decision to overrule Hernandez's objections to Gina's testimony and its decision to admit the exhibit were discretionary calls, and both fell inside the zone of reasonable disagreement. *See Wyatt*, 23 S.W.3d at 28. We overrule the arguments presented in issue five.

F. Impeachment Evidence

In issue six, Hernandez argues the trial court erred by allowing the State to impeach him by asking him, in cross-examination, whether he knew that "while [he] lived with [Gina] that she was suicidal because of what you did to her?", that his son became aggressive toward Gina after Hernandez left the house, and whether Hernandez knew that Gina had hallucinated, which had caused her to relive the sexual assaults.

---

[11] Hernandez has not argued that the exhibit summarizing Gina's testimony was not a relevant or accurate summary or claimed that the prejudicial value of the exhibit outweighed the exhibit's relevance. *See generally Coble v. State,* 330 S.W.3d 253, 282 (Tex. Crim. App. 2010) (noting that trial court errors in admitting evidence are not reversible if the same evidence is admitted elsewhere in the trial); *Wheatfall v. State*, 882 S.W.2d 829, 839-40 (Tex. Crim. App. 1994) (concluding that error occurred when the trial court admitted a five-page handwritten summary of the defendant's violent criminal history, but the error was harmless because the underlying evidence on which the summary was based was also admitted in the trial).

The State contends that Hernandez opened the door to the impeachment by testifying in the trial that he was concerned about Gina's well-being, was involved in her life and activities, and that he actively monitored and disciplined his children. During the trial, Hernandez's counsel objected when the State tried to impeach Hernandez with questions designed to allow the jury to determine how well he actually knew and cared for Gina. Hernandez also claimed that the prosecutor's questions about these matters were speculative, argumentative, and assumed facts not in evidence. When the trial court overruled Hernandez's objections, Hernandez answered: "I hadn't done anything to her. What did I do?"

On appeal, the State argues that the questions were proper because Hernandez opened the door by representing to the jury that he is a good father who supports his family and disciplines his children. According to the State, because Hernandez presented evidence designed to give the jury a false impression about his parenting abilities, it was entitled to respond by asking him whether he knew about several matters that a jury could reasonably have expected a caring parent to know.

In a criminal trial, "if the defendant offers evidence of his good character, the prosecution can introduce its own character evidence to rebut the implications of the defendant's character evidence." *Harrison v. State*, 241 S.W.3d 23, 27 (Tex. Crim. App. 2007); *see* Tex. R. Evid. 404(a)(2)(A) (in a criminal case, if the defendant

offers evidence pertinent to a defendant's trait, the prosecutor may offer evidence to rebut it). Once a defendant opens the door to evidence pertinent to his traits, trial courts may permit the State to introduce testimony, including cross-examination, designed to show specific instances of conduct that would impeach the defendant's testimony about the trait at issue. *See Wilson v. State*, 71 S.W.3d 346, 350 (Tex. Crim. App. 2002). Therefore, we agree with the State's argument that by portraying himself as a caring and loving parent, Hernandez opened the door to questions like those that are at issue here, if the questions were asked in good faith. While Hernandez argued at trial that no good faith basis existed for the questions, he did not advance that argument in his appeal, nor does the record show that he asked the trial court to require the prosecutor to state the factual basis for the questions that he is complaining about in this issue. Because a caring father's lack of actual knowledge about his child's well-being opened the door to impeachment on a variety of specific matters that would be relevant to the impression Hernandez tried to create in the jury's mind, we hold the trial court did not abuse its discretion by allowing the questions Hernandez has challenged in issue six. *See generally* Tex. R. Evid. 404(a)(2)(A).

Hernandez also argues that the did-you-know questions were impermissible because the State failed to lay a proper predicate before asking the questions phrased

41

in the did-you-know form. Yet the proof of a predicate fact is not required when the door is opened to a party's right to ask did-you-know types of questions, as the purpose of the questions is to impeach the witness's own testimony. *See generally* Tex. R. Evid. 608(b) (unless the evidence is to prove that a person has been previously convicted of a crime, a party may not offer extrinsic evidence to rebut the witness's answer to a did-you-know type of question when the question's purpose was to impeach the witness's testimony about his character).

Hernandez also suggests that allowing the prosecutor to impeach him with did-you-know questions violated his right to confront whomever served as the source of the prosecutor's information for the questions. Hernandez, however, failed to preserve this argument for review on appeal, since he made no Confrontation Clause objections to the first four of the five questions at issue. Here, the record shows that Hernandez answered four questions in response to did-you-know types of questions before Hernandez asserted a Confrontation Clause claim. Because his Confrontation Clause objection was untimely, we do not reach it in resolving issue six. *See Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) (concluding that because the defendant failed properly to preserve his Confrontation Clause claim, he forfeited his right to appellate review on that claim); *see also* Tex. R. App. P. 33.1 (requiring a party to preserve error for appellate review by showing that he

made a timely request, objection, or motion). Because the arguments Hernandez raises in issue six either lack merit or were not properly preserved for appellate review, issue six is overruled.

G. Detective Rizk's testimony that Gina appeared to be reliable when she told Mayra about the assaults

In issue seven, Hernandez argues the trial court abused its discretion by denying his motion seeking a mistrial after the prosecutor asked Detective Rizk about the impression he had of Gina based on his observations of her during her interview at Children's Safe Harbor. In response to the question, Detective Rizk responded: "I found her to be very believable[.]" At that point, Hernandez's counsel interrupted, and objected to Detective Rizk testifying about Gina's credibility. The trial court sustained the objection and instructed the jury to disregard the detective's answer. When Hernandez's counsel followed that ruling up with a request for a mistrial, the trial court denied the request.

We review a trial court's decision to deny a motion for mistrial using an abuse-of-discretion standard. *See Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). Mistrials are rare, as "[a] mistrial is an appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Id.*; (quoting *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)). "Whether

43

an error requires a mistrial must be determined by the particular facts of the case."
*Id.*

Generally, an attorney's asking a witness "an improper question will seldom call for a mistrial, because, in most cases, any harm can be cured by an instruction to disregard." *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999) (citing *Hernandez v. State*, 805 S.W.2d 409, 414 (Tex. Crim. App. 1990)). To obtain a mistrial due to an allegedly improper question, the party complaining about the question must demonstrate in his appeal that he was prejudiced, and that the prejudice is of "such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Id.* In Hernandez's case, the record shows that the trial court instructed the jury to disregard the detective's answer.

The Court of Criminal Appeals has identified three factors in evaluating whether a mistrial is required. *Archie v. State*, 340 S.W.3d 734, 739 (Tex. Crim. App. 2011). The factors considered concern (1) the severity of the misconduct, (2) the measures the trial court adopted to cure the misconduct, and (3) the certainty of conviction without the misconduct. *Id.* The question posed to Detective Rizk does not appear to be one the prosecutor intentionally designed to elicit a response about the victim's credibility. Instead, the question, as it was posed, was open-ended, and the trial court as well as the prosecutor likely expected the detective to answer by

stating that Gina appeared to be calm, nervous, or frightened while being interviewed at Children's Safe Harbor. The trial court apparently did not view the witness's response as the one that was expected, and without more, the fact the prosecutor asked an open-ended question is not evidence showing that prosecutorial misconduct occurred.

The record also fails to establish that the detective's response was incurably prejudicial. When Hernandez objected to the detective's response, the trial court quickly instructed the jury to disregard the detective's answer. We find nothing in the record to suggest that the jury disregarded the trial court's instruction, so we must presume the instruction was followed. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (relying on the presumption that the jury followed the judge's instructions).

Finally, the record establishes that the jury would have convicted Hernandez regardless of Detective Rizk's testimony that he thought Gina gave a believable interview during her forensic exam at Children's Safe Harbor. Gina testified during Hernandez's trial, and we have no doubt that the jury formed its own impressions about whether she was a believable witness based on the testimony she gave during the trial. Moreover, the jury's verdict in this case does not rest solely on Gina's credibility, as the Y-STR report shows that the crime lab found a Y-chromosome

45

profile that tracked Hernandez's profile in Gina's sexual organ. We also note that there was strong circumstantial evidence supporting the jury's findings of guilt, as Hernandez fled twice from the authorities and apologized to Gina for what the jury could reasonably have viewed as sexually criminal misconduct.

We conclude the jury either disregarded Detective Rizk's comment about Gina being credible or if not, the answer he provided was not harmful. We hold the trial court did not abuse its discretion by denying Hernandez's motion for mistrial. Issue seven is overruled.

### III. Cumulative Error and Excessive Sentence

#### A. Cumulative Error

In issue eight, Hernandez argues that the various errors he claims the trial court committed during his trial resulted in an unfair trial. *See* Tex. R. App. P. 44.2(b). We disagree with Hernandez's claim that he received an unfair trial based on the evidentiary errors we have assumed occurred in his trial. We have already explained why those errors had either no or but slight effect on the jury's decisions finding Hernandez guilty on the elements of the assaults, as those crimes are alleged in the indictments relevant to his trial. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998) (citing *King v. State*, 953 S.W.2d 266 (Tex. Crim. App. 1997)). We must disregard the errors that we have assumed, but not decided,

46

occurred based on our conclusion that the errors we have identified had no effect on Hernandez's substantial rights. *See* Tex. R. App. P. 44.2(b); *Johnson*, 967 S.W.2d at 417. Issue eight is overruled.

B. Length of Sentence

In issue twelve, Hernandez argues that a life sentence for the crime of continuous sexual assault of a child constitutes a cruel and unusual punishment, which he claims violates the Eighth and Fourteenth Amendments to the United States Constitution. *See* U.S. CONST. amend. VIII; amend. XIV. We conclude, however, that Hernandez waived his right to complain about the alleged unconstitutionality of his sentence because he failed to raise these claims at trial.

To preserve an error for review on appeal, the defendant must present both a timely objection and secure a ruling from the trial court about the complaint that he desires to pursue in an appeal. *See* Tex. R. App. P. 33.1(a). Stated another way, "[t]he point of error on appeal must comport with the objection made at trial." *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (citing *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986)).

The offense for the continuous sexual abuse of a child carries a potential life sentence. Tex. Penal Code Ann. § 21.02(h) (West Supp. 2017). Thus, the sentence Hernandez received in the punishment hearing for the crime of continuous sexual

47

abuse is in the range the Legislature authorized for the crime the jury found Hernandez committed. *Id.* The record from the trial court shows that Hernandez never objected to his sentence on any grounds, much less those that he argues in his brief. Tex. R. App. P. 33.1. Moreover, even claims alleging constitutional violations are generally subject to the rules that apply to preserving error for an appeal. *Garza v. State*, 435 S.W.3d 258, 260-61 (Tex. Crim. App. 2014) (explaining that "all errors—even constitutional errors—may be forfeited on appeal if an appellant failed to object at trial"); *Diamond v. State*, 419 S.W.3d 435, 440 (Tex. App.—Beaumont 2012, no pet.) (explaining that the defendant's failure to object to a sentence claiming the sentence was cruel and unusual when the defendant was in the trial court resulted in a waiver of that argument upon appeal).

The Legislature authorized juries to impose the sentence at issue, life in prison, upon being found guilty of the crime of continuously sexually assaulting a child. Tex. Penal Code Ann. § 21.02(h). We hold that Hernandez forfeited his right to complain that his sentence is cruel and unusual because he failed to object on that basis when he was sentenced. Tex. R. App. P. 33.1. Therefore, we overrule Hernandez's twelfth issue.

Finally, we note that a clerical error exists in the judgment in trial court Cause Number 16-09-10158-CR.[12] Neither party pointed this error out in their briefs. The error in this case is an error in one of the recitals in the judgment that reflects that the trial court assessed Hernandez's ten-year sentence, but the record reveals that the jury decided to sentence Hernandez to prison for ten years.

We have the authority to reform judgments to make the record speak the truth. *See* Tex. R. App. P. 43.2(b); *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992). We may act *sua sponte* to reform an incorrect judgment, and we may have a duty to do so. *See French*, 830 S.W.2d at 609; *Asberry v. State*, 813 S.W.2d 526, 530 (Tex. App.—Dallas 1991, pet. ref'd). To correct the clerical error that we identified in trial court Cause Number 16-09-10158-CR, we reform the judgment by deleting the language stating that the trial court assessed punishment to make it state that the punishment was assessed by the jury in that cause.

---

[12] The judgment of conviction in Cause Number 16-09-10164-CR, Count 1, and in Cause Number 16-09-10164-CR, Count 2, states that the jury assessed Hernandez's punishment in those cases. In contrast, the judgment in Cause Number 16-09-10158-CR, which assesses a ten-year sentence, states the trial court assessed the punishment in that case. The record shows, however, that the jury assessed all three of Hernandez's punishments and that the trial court pronounced those punishments in the punishment phase of his trial.

49

Conclusion

For the reasons explained above, we affirm the trial court's judgments.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on March 13, 2018
Opinion Delivered October 10, 2018
Do Not Publish

Before McKeithen, C.J., Kreger and Horton, JJ.